Case 4:22-cv-04518   Document 78   Filed on 03/31/25 in TXSD   Page 1 of 11

United States District Court
Southern District of Texas
**ENTERED**
March 31, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| COLFLETAR SAS and CTR GROUP SA, | § § § § § | CIVIL ACTION NO 4:22-cv-04518 |
| Plaintiffs, | | |
| vs. | § § § | JUDGE CHARLES ESKRIDGE |
| THOMPSON PIPE GROUP INC, *et al*, Defendants. | § § § § | |

ORDER AND OPINION
ON MOTIONS FOR SUMMARY JUDGMENT

The motion by Plaintiffs Colfletar SAS and CTR Group SA for summary judgment as to the counterclaims asserted against them is denied. Dkt 64.

The motion by Defendants Thomas Pipe Group, Inc, and TPG Pressure, Inc, for partial summary judgment as to certain affirmative defenses asserted against their counterclaims is granted. Dkt 62.

1. Background

Thompson Pipe is an industrial pipe distributor. Colfletar is a provider of transportation services, including services as a freight forwarder. Thompson Pipe hired Colfletar to facilitate the movement of glass-reinforced plastic pipes from Turkey to Houston, Texas, and then onward to job sites in Texas. Dkts 1 at ¶9 (complaint).

Thompson Pipe purchased the subject pipe from a Turkish pipe manufacturer referred to as *Subor*. Dkts 64-14 at 15:2–24 (Heaton deposition) & Dkt 64-1 (exclusive distribution agreement). On behalf of Thompson Pipe, Colfletar entered into a charter party with an entity

referred to as *Spliethoff* to transport the pipe and fittings from Turkey to Houston. Dkt 1 at ¶9; see also Dkt 62-2 at 2 (seaway bill, identifying Subor as "shipper," Thompson Pipe as "consignee," and Spliethoff as "carrier"). A *charter party* is a contract for the use or lease of a vessel subject to general maritime law. Thomas J. Schoenbaum, 2 *Admiralty and Maritime Law* §11:1 at 2 (6th ed 2018).

Thompson and Colfletar had worked together on two prior occasions. The first was in late 2021 regarding a shipment from Colombia to the United States. The other was a shipment in April 2022 regarding the same type of pipe from Turkey to the United States. Dkt 64-16 at 29:7–31:20 (Lloreda deposition). That latter agreement also involved transporting the pipe from Subor's facility in Turkey. Id at 30:7–17.

The terms of Colfletar's offer as accepted by Thompson Pipe stated:

- **Offer includes**: Inland transportation from factory facilities to Derince port, port charges at Derince, customs at Derince, load ops on board vessel, lashing materials, secure works on board, discharge at Houston, port charges at Houston, Inland transportation from Houston port to Conrad, TX, Inland from Conrad, TX to job site, customs at USA; **Colfletar´s Supervision**.
- We as COLFLETAR will issue a report once Pipes arrive to Derince Port, and also a report once pipes arrive to Houston port and once arrive to Job site.
- We as COLFLETAR will follow all the operation in all the supply chain, from receive the pipes at Subor´s facilities, until deliver the pipes at Job site.
- **Offer does not include**: duties at USA, discharge the pipes at Conrad from truck to floor, load the pipes at Conrad from floor to trucks, discharge the pipes at Job site from trucks to floor.

Ibid (emphasis original).

Subor packed the shipment in wood packaging material. Dkt 64-14 at 25:16–26:11 (Heaton deposition). Federal law and regulation require that such wood have proper treatment, packaging material, and marking prior to entry into the United States. See 7 USC §7701, *et seq*; 7 CFR §319.40-3(b)(3). Given the shipment's origin in Turkey, there was also an independent obligation to ensure that the wood was both properly treated and marked under what's known as the Phytosanitary Measures 15, to which Turkey is a signatory. See Dkt 64 at 6. The wood-packaging material was indeed stamped, but the markings were later

assessed to be likely fraudulent. Dkt 65-1 at 4 (Customs and Border Patrol report).

Colfletar arranged for the shipment to travel by truck from Subor's facility to a port in Turkey. Colfletar maintained an in-person supervisor to provide Thompson Pipe updates of the shipment, including photographs of the pipe and its wood packaging. It then facilitated the shipment's loading onto an overseas freighter. The freighter then set out from Turkey in September 2022 and arrived in Houston the following month. See generally Dkts 62-1 at 3–4 (shipment correspondence), 64-14 at 44:8–15 (Heaton deposition), 64-16 at 58:7–24 (Lloreda deposition) & 65-1 at 3 (CBP report).

Port authorities in the United States initially cleared the shipment for entry on October 14, 2022. Dkt 64-7 (notification of initial customs clearance); see also Dkt 65-1 at 3 (CBP report). And some of the shipment moved onward to Thompson Pipe job sites after that initial clearance. Dkt 64-7 at 3–4 (email correspondence).

But Customs and Border Patrol in Houston inspected the remaining cargo on October 30th and discovered the presence of timber pests. These included insects and snails which had bored within the wood, while also being present on the surface. Dkts 64-8 at 4–5 (Russo report) & 65-1 at 2–3 (CBP report). Colfletar concedes that it did not "identify the presence of insects or insect infestation in the packaged Cargo or in the WPM" at any point during the shipping process. Dkt 64 at 8.

This infestation triggered an Emergency Action Notification mandating that the entire shipment be re-exported. Dkt 62-3 at 2 (EAN 436494). This required Thompson Pipe to return all of the pipe that had delivered to its job sites for reloading on a ship in the port of Houston. Dkt 64-14 at 88:18–89:5 (Heaton deposition). The US Department of Agriculture also issued a later EAN, which noted that the shipment lacked the proper markings with respect to the International Plant Protection Convention as required under 7 CFR §319.40, and that the infestation indicated that the wood was infested prior to being loaded

on the vessel. Dkts 62-4 (EAN 441669) & 56-2 at ¶37 (Tucker report).

Colfletar arranged for the shipment to be fumigated off the coast of Altamira, Mexico. Dkt 64-16 at 82:10–84:1 (Lloreda deposition). Colfletar arranged and supervised the fumigation service. Id at 98:22–99:6. The parties agree that CBP and USDA both advised against onboard fumigation due to poor results, but they differ regarding the nature of the authorization to fumigate the shipment onboard the vessel. Dkts 36 at 18 & 64 at 10–11; see also Dkt 64-10 (email discussing USDA fumigation standards).

The shipment returned to Houston in late November, only to again be found with "wood boring pests." Dkt 64-8 at 8 (Russo report); see also Dkt 62-4 (EAN 443343). This required a second re-export and fumigation of the shipment. Dkt 64-14 at 109:24–110:9) (Heaton deposition).

Colfletar filed a complaint against Thompson Pipe and the shipment *in rem* upon next return to the Port of Houston, seeking payment for its services. Dkt 1 at ¶¶7–8, 16–18. Colfletar also sought a writ of attachment, although it later agreed to release the shipment to Thompson Pipe. Dkts 4, 12 & 13.

Thompson Pipe filed a counterclaim against Colfletar for breach of maritime contract and negligence. Dkt 36 at 20–23. It claims that it suffered "significant damages with respect to this shipment of pipes" due to breach of contract and negligence by Colfletar, including delays, fumigation costs, storage and handling charges, additional transportation costs (both by sea and land), and government penalties. Dkt 62 at 3–4. Thompson Pipe also filed a motion for countersecurity, which was denied. Dkts 37 & 44.

The parties both filed motions for summary judgment with respect to the counterclaims asserted by Thompson Pipe. Dkts 62 & 64.

### 2. Legal standard

Rule 56(a) of the Federal Rules of Civil Procedure requires a court to enter summary judgment when the

4

movant establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is *material* if it "might affect the outcome of the suit under the governing law." *Sulzer Carbomedics Inc v Oregon Cardio-Devices Inc*, 257 F3d 449, 456 (5th Cir 2001), quoting *Anderson v Liberty Lobby Inc*, 477 US 242, 248 (1986). And a dispute is *genuine* if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v CCC & R Tres Arboles LLC*, 736 F3d 396, 400 (5th Cir 2013), quoting *Anderson*, 477 US at 248.

The summary judgment stage doesn't involve weighing the evidence or determining the truth of the matter. The task is solely to determine whether a genuine issue exists that would allow a reasonable jury to return a verdict for the nonmoving party. *Smith v Harris County*, 956 F3d 311, 316 (5th Cir 2020). Disputed factual issues must be resolved in favor of the nonmoving party. *Little v Liquid Air Corp*, 37 F3d 1069, 1075 (5th Cir 1994). All reasonable inferences must also be drawn in the light most favorable to the nonmoving party. *Connors v Graves*, 538 F3d 373, 376 (5th Cir 2008).

### 3. Analysis

Addressed first is the motion by Colfletar for summary judgment on the counterclaims brought by Thompson Pipe for breach of maritime contract, negligence, and damages. Dkt 64. Discussed next is the motion by Thompson Pipe for partial summary judgment as to several affirmative defenses asserted by Colfletar. Dkt 62.

#### a. Counterclaims by Thompson Pipe

Juries are instructed that common sense plays a role in assessing the evidence at trial. For example, Pattern Charge 1.08 of the Pattern Jury Instructions (Criminal Cases) for the Fifth Circuit provides, with emphasis:

> In considering the evidence, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified *in the light of*

5

> *common experience.* In other words, you may make deductions and reach conclusions *that reason and common sense lead you to draw* from the facts which have been established by the evidence.

See also Pattern Charge 3.3 of the Pattern Jury Instructions (Civil Cases) for the Fifth Circuit: "Circumstantial evidence is evidence that proves a fact from which you can logically conclude another fact exists."

The same pertains on summary judgment, just as it will to the extent that this particular action later proceeds by way of bench trial. In short, the district court is equally able to employ its common sense, drawing logical conclusions based on reason. *American Communications Association, CIO v Douds*, 339 US 382, 411 (1950). And common sense here requires denial of Colfletar's motion for summary judgment.

*As to the claim for breach of maritime contract*, admiralty law applies to all maritime contract claims. Schoenbaum, 1 *Admiralty & Maritime Law* 5:1 at 285. Basic principles of maritime contract interpretation include that (i) contracts are to be construed by the text's plain language, and terms are to be given their ordinary meaning, (ii) terms shouldn't be interpreted such that they're rendered "meaningless or superfluous," and (iii) extrinsic evidence should only be considered if the plain language is ambiguous." Id at 285–86.

Colfletar contends that it violated no contractual duties to Thompson Pipe. Dkt 64 at 13–14. Missing is any citation to an exception allowing it to deliver a pest-infested shipment specifically prohibited by federal law. To the extent that it argues it complied with duties to "properly inspect" the shipment and to provide for its "supervision," common sense suggests that a genuine dispute of material fact obviously exists. Compare Dkt 64 at 13–14 (stating agreement didn't explicitly obligate it to inspect for infestation), with Dkt 65 at 18–19 (terms such as "supervision" at "customs at the USA" reasonably meant Colfletar had duty to inspect for compliance with customs

6

standards). This includes evidence provided by Thompson Pipe that competent "supervision" would have discerned that (i) the WPM markings were improperly stamped, (ii) the wood contained insect exit holes, and (iii) snails were present on the surface of the wood. See 56-2 at 9–10 (Tucker report); see also Dkts 65-1 (CBP report noting same) & 65-2 (photo of snail).

*As to the claim for negligence*, principles of maritime negligence apply, as opposed to those of common-law negligence. Schoenbaum, 1 *Admiralty & Maritime Law* §5:4 at 290. But the elements of maritime negligence are "essentially the same as land-based negligence under the common law," and include (i) the existence of a legal duty, (ii) a "breach of that duty by engaging in conduct that falls below the applicable standard or norm," (iii) the breach reasonably caused a resulting injury, and (iv) the plaintiff suffered loss, injury, or damage. Id at 292.

Colfletar asserts that it had no duty to conduct any inspection. But it argues in such respect only that *the contract itself* imposed no such obligation. Dkt 64 at 20–21. That isn't true, or at least as noted above, a disputed issue of fact exists on the point. And beyond the contract, Colfletar knowingly undertook duties that would bring its work under purview of federal law. It thus assumed a duty to do so reasonably and with due care.

Colfletar also argues that it couldn't have discovered the infestation even in the exercise of due care. Dkt 64 at 21–22. Common sense leads one to wonder how visible snails and exit holes were beyond its competence, if it indeed cared about doing its job properly. See Dkts 65-1 at 4 (CBP report) & 65-2 at 2 (photo of snail).

*As to damages*, Colfletar argues that a quantity discount negotiated by Thompson Pipe as part of its settlement agreement with Subor "on all future purchases" somehow constitutes "double recovery" if it obtains damages from itself. Dkt 64 at 23. How this results in double recovery isn't clear, much less undisputed on this record. Such argument will be considered with damages at trial, if then appropriate. But see *Baldwin v Mortgage*

7

*Electronic Registration System, Inc*, 2020 WL 4227591, at *3 (SD Tex) (third party isn't contractual beneficiary unless agreement "clearly and fully" expresses intention to confer benefit).

The motion for summary judgment by Colfletar will be denied in all respects.

### b. Affirmative defenses by Colfletar

Colfletar asserts the following affirmative defenses:

- o   33: damages are due to "own acts, omissions, and/or negligence" of Thompson Pipe;
- o   35: intervening, superseding, or independent causes;
- o   36: failure to mitigate damages;
- o   37: failure to join indispensable party;
- o   38: "defenses, limitations, and conditions precedent" under the Federal Rules of Civil Procedure;
- o   44: statute of limitations, waiver, estoppel, voluntary payment, accord and satisfaction, ratification, consent, settlement and release, merger, novation, acquiescence, discharge, and laches; and
- o   45: entitlement to contribution and indemnity.

Dkt 24 at 5–7.

Colfletar failed to respond to the motion by Thompson Pipe seeking dismissal of these defenses. This is "taken as notice of no opposition." Local Rule 7.4. The motion for summary judgment will thus be granted, and those affirmative defenses will be dismissed.

Colfletar also asserts these other affirmative defenses:

- o   39: defenses, limitations and exclusions under relevant shipping documents and applicable statutes;
- o   40: defenses under bill of lading;
- o   41: damages cap under United States Carriage of Goods by Sea Act; and

- - 43: defenses under whatever written instrument "is found to ultimately constitute the contract of carriage."

Dkt 24 at 5–7.

As to these, Thompson Pipe asserts that Colfletar cannot qualify so as to be covered under the liability exceptions of the Carriage of Goods by Sea Act, an uncodified statute previously codified at 46 USC app §1312. Dkt 62 at 8–9. It argues that Colfetar isn't a carrier or a qualified subcontractor of one, and didn't otherwise perform any qualifying carrier duties. Id at 8–10.

COGSA applies to "all contracts for carriage of goods by sea to or from ports of the United States in foreign trade," while defining such trade as "the transportation of goods between ports of the United States and ports of foreign countries." COGSA §13. Overall, it serves to define the relationship, rights, and duties of shippers and carriers by outlining carrier obligations, ensuring carriers cannot be contracted out of obligations, and affording carriers liability protection. Schoenbaum, 1 *Admiralty & Maritime Law* §10:16 at 952. COGSA protections are triggered when a carrier issues a bill of lading. Id at 953. These cover carriers and subcarriers during the time the cargo is at sea, although they may be contracted to cover during land transportation. Ibid; *Norfolk Southern Railway Co v Kirby*, 543 US 14, 29 (2004).

Colfletar argues that it should be considered a carrier because, in its view, the Fifth Circuit determines carriers by "function rather than form." Dkt 66 at 6. While such argument may be expedient, Colfletar can't have it both ways, arguing that it was *more* involved when seeking to lessen its liability, while otherwise arguing (as above) that it was *less* involved when that, too, might lessen its liability. Regardless, Colfletar has consistently argued that it merely provided "logistical services." For example, see Dkts 67 at 4 & 71 at 4. It has also repeated throughout this litigation that it was simply a "freight forwarder" or "logistics provider." For example, see Dkts 67 at 4–6, 69

9

at 2–4 & 71 at 2–3; see also Dkt 71-3 at 16:24–17:2 (hearing transcript of 11/21/2023).

No evidence suggests that Colfletar did anything more than that here. It cites to another Southern District of Texas case where a freight forwarder was found to be considered a "carrier." Dkt 66 at 7, citing *Rainly Equipos de Riego S.R.L. v Pentagon Freight Services, Inc*, 979 F Supp 1079, 1082–83 (SD Tex 1997). But the freight forwarder there "did more than merely arrange for transportation"—namely, unloaded the cargo, stored it, loaded it into containers, arranged for shipment through a subsidiary, and provided all the invoicing. Id at 1082. And the court noted that freight forwarders "cannot typically be held liable under COGSA as a carrier" because they "normally only act[ ] for the shipper in arranging for transportation of the cargo." Ibid.

Colfletar also contends that the bill of lading contractually extended to it the liability limitations of COGSA through what's known as a *Himalaya Clause*. Dkt 66 at 8. Such a clause allows for the agents or contractors of a carrier to take advantage of COGSA's defenses and liability limitations. Schoenbaum, 1 *Admiralty & Maritime* 10:8 at 908 (indicating typical inclusion of stevedores, terminal operators, and other subcontractors of ocean carriers). But Colfletar here was neither an agent nor a subcontractor of the carrier, Spliethoff. It was instead an agent of Thompson Pipe, providing it freight-forwarding services. Dkt 71 at 5.

Also rejected is passing argument by Colfletar that it served as a "servant" of Spliethoff by providing "services" to it. Dkt 66 at 5, citing Dkt 66-2 (bill of lading). Colfletar fails to explain the "services" putatively provided to Spliethoff. Regardless, the record is undisputed that it was serving as the agent of Thompson Pipe.

The motion for summary judgment will also be granted in this regard, and those affirmative defenses will be dismissed.

4. Conclusion

The motion for summary judgment by Plaintiffs Colfletar SAS and CTR Group SA is DENIED. Dkt 64.

The motion for partial summary judgment by Defendants Thompson Pipe Group, Inc and TPG Pressure, Inc is GRANTED. Dkt 62.

Affirmative defenses 33, 35 through 41, and 43 through 45 as asserted by Plaintiffs are DISMISSED.

SO ORDERED.

Signed on March 31, 2025, at Houston, Texas

_____
Hon. Charles Eskridge
United States District Judge